COMMONWEALTH *vs.* MICHAEL E. ELLER.

No. 05-P-632.

Berkshire. February 14, 2006. - June 22, 2006.

Present: DUFFLY, BROWN, & KATZMANN, JJ.

*Search and Seizure,* Warrant, Affidavit, Probable cause, Forcible entry by police. *Constitutional Law,* Search and seizure, Probable cause. *Probable Cause. Controlled Substances. Firearms.*

Information in an affidavit in support of a search warrant supplied both probable cause for the police to believe that controlled substances would be found in a hotel room occupied by the defendant [569-571], and sufficient information to justify the inclusion of a no-knock provision in the warrant [571-572], a conclusion that was not altered by disputed testimony concerning the circumstances encountered by police upon execution of the warrant [572].

Evidence at a criminal trial was sufficient to convict the defendant of possession with intent to distribute heroin [573-574] and possession of a firearm during the commission of a felony [574-575].

INDICTMENTS found and returned in the Superior Court Department on February 14, 2002.

A pretrial motion to suppress evidence was heard by *Daniel A. Ford,* J., and the cases were heard by *Thomas J. Curley, Jr.,* J.

*Stewart T. Graham, Jr.,* for the defendant.

*Joseph A. Pieropan,* Assistant District Attorney, for the Commonwealth.

BROWN, J. In a jury-waived trial on a nine-count indictment, the defendant was convicted of eight counts, including three related to possession, distribution, and trafficking of cocaine; one count of possession of heroin with intent to distribute; and various weapons charges, including possession of a firearm while in the commission of a felony. He was acquitted of one count of possession of cocaine with intent to distribute, second

offense. On appeal the defendant claims that the denial of his pretrial motion to suppress evidence seized from his motel room was error. He argues that the police should not have been permitted to enter without knocking and announcing their presence and that the search warrant affidavit did not provide probable cause to believe that the drugs and related items were likely to be located in his motel room. The defendant also argues that the evidence was insufficient to support his convictions of possession of heroin with the intent to distribute and possession of a firearm in the commission of a felony.

1. *Probable cause.* We turn first to the defendant's claim that the search warrant affidavit lacked probable cause to tie his illegal drug sales to his motel room. "[O]ur inquiry as to the sufficiency of the search warrant application always begins and ends with the 'four corners of the affidavit.' " *Commonwealth* v. *O'Day*, 440 Mass. 296, 297 (2003), quoting from *Commonwealth* v. *Villella*, 39 Mass. App. Ct. 426, 428 (1995). The information in the affidavit must be adequate to establish a timely nexus between the defendant and the location to be searched and to permit the determination that the particular items of criminal activity sought reasonably could be expected to be found there. See *Commonwealth* v. *Cinelli*, 389 Mass. 197, 213, cert. denied, 464 U.S. 860 (1983); *Commonwealth* v. *O'Day*, *supra* at 298.

We set forth the relevant facts in the affidavit of Sergeant David B. Foley, dated January 22, 2002, which accompanied the search warrant application.[1]

a. *Affidavit.* Sergeant Foley, a State trooper with considerable experience and training as a narcotics investigator, is a veteran member of the narcotic unit of the Berkshire County detective unit, as well as a member of the Berkshire County drug task force. Over the past ten years, Foley has participated in an ongoing investigation of the defendant's suspected drug activities, commencing with an undercover purchase of cocaine from

---

[1]The next day police obtained and executed a second search warrant for the defendant's recording studio, where a small amount of "crack" cocaine was found along with used (empty) packaging materials and a variety of recording equipment. On appeal the defendant has not presented any issue related to the search of his studio.

the defendant on January 17, 1992, which resulted in the defendant's arrest and conviction. The defendant is described as a thirty year old white male, who resided with his girlfriend, Heather Alexander, at 49 Arnold Place, Apt. B, in North Adams until about January 13, 2002, when he left and rented a motel room for two weeks at the Chimney Mirror Motel, located at 295 Main Street, Williamstown. The affidavit sets forth the defendant's seventeen prior convictions from 1986 to 2000; among them are three drug-related offenses and seven convictions of assault and battery, including a 1994 conviction of assault and battery on a police officer.

On May 2, 2001, the affiant and another police officer confronted one James Cieslik, informing him that members of the Berkshire County drug task force had made a controlled purchase of cocaine from him while he was working at the Pitchers Mound bar. In return for consideration in relation to that offense, Cieslik agreed to cooperate with the investigation of the defendant.

Cieslik told police that he began buying cocaine and marijuana from the defendant in 1999. According to Cieslik, when he wanted drugs, he would page the defendant, who would then show up at Cieslik's home or work with the order. At first, the defendant did not let Cieslik know where he lived. Eventually, in approximately May, 2000, Cieslik went to a small apartment at 926 Mohawk Trail (which, Sergeant Foley later ascertained, was, according to police and Registry of Motor Vehicles records, the defendant's former address), where he bought marijuana and cocaine from the defendant. While there, the defendant displayed two guns — a 9 millimeter handgun and a small machine gun with holes in the barrel. Cieslik explained to police that by May, 2001, the defendant lived with his girlfriend in another apartment, on Arnold Street. Cieslik had been inside the Arnold Street apartment once when he bought cocaine and at that time he noticed large stacks of cash. On a few occasions, Cieslik had met the defendant outside of the Arnold Street apartment to "make drug deals."

At the end of April, 2001, and until the beginning of July, 2001, police began to work with a confidential informant, identified in the affidavit as CRI #1. CRI #1 had a long and detailed

history of supplying police with information that led to the issuance of search warrants and was used to obtain convictions. CRI #1 told police that he had purchased cocaine from the defendant. CRI #1 also reported that the defendant said he was in the process of renovating a store in North Adams to turn it into a music recording studio.

Between May 5, 2001, and July 7, 2001, CRI #1 reported to police that he had purchased cocaine from the defendant on ten separate occasions. On eight of those occasions, the sale occurred in North Adams: in three instances the defendant's motor vehicle was the point of sale, in three instances the sale occurred at the recording studio, once the sale was inside a local bar, and one sale was at an undisclosed location in North Adams. On July 3, 2001, CRI #1 made a controlled buy of crack cocaine from the defendant at the corner of Arnold Place and Church Street in North Adams.

From the summer of 2001 to the date of the search warrant application, January 22, 2002, the police received additional information from a second confidential informant, CRI #2. CRI #2, like CRI #1, had a long history of reliability, which included making controlled buys and providing information that led to the issuance of at least two search warrants and the arrest and conviction of at least three individuals. CRI #2 reported that he had purchased cocaine from the defendant. CRI #2 also stated that he knew that the defendant used rental cars to deliver drugs to customers on the streets of North Adams, at their home or work, or at a variety of local bars. CRI #2 reported that weekly, on Thursday or Friday nights, the defendant sold cocaine in one of the area bars.

The last informant named in the affidavit is one Peter Cardinal. In January, 2002, after police informed Cardinal that they had made two controlled buys of illegal drugs from him, he agreed to cooperate in the investigation of the defendant. Cardinal told police that he had been purchasing cocaine from the defendant over a period of at least seven years. The location for the purchases included Cardinal's home or work, the parking lots of various local stores, the defendant's recording studio, and on four or five occasions, inside the defendant's apartment on Arnold Place. Cardinal explained that the defendant had

been living at the Arnold Place address since approximately 2000, first in a downstairs apartment, and then, since about 2001, in an upstairs apartment. During one of Cardinal's visits to the downstairs apartment, the defendant displayed a gun that he kept in a kitchen closet. Cardinal had purchased cocaine from the defendant inside the defendant's upstairs apartment at Arnold Place two or three times, most recently in about September or October, 2001.

On January 11, 2002, at the request of the police, Cardinal paged the defendant. Although the defendant returned the page at about 7:00 P.M. from the Arnold Place apartment, no arrangements were made in relation to the purchase of narcotics. On January 12, 2002, at about 2:00 P.M., the defendant called Cardinal and told him he had had a fight with Heather and was staying at a motel. Two days later, Cardinal reported to police that he had received a call from the defendant that appeared in his caller identification box as having been made from the Chimney Mirror Motel.

On January 15, 2002, the defendant again called Cardinal and told Cardinal that he was "all set," meaning that he had cocaine to sell. Cardinal said he wanted $200 worth of cocaine and the defendant agreed. The defendant told Cardinal to page him and said that he would give Cardinal a little extra to sell. At about 5:30 P.M. Cardinal twice paged the defendant, under the supervision of the police. The defendant finally returned the call and told Cardinal to meet him at the River Street package store.

The surveillance team was notified of the location. Cardinal drove there at about 5:35 P.M., followed by Officer James Foley. By the time Cardinal arrived, the surveillance team was in place and the defendant was parked in the lot. The defendant got out of his car and joined Cardinal in his car. The defendant handed Cardinal cocaine valued at about $1,150 in exchange for $200, and told Cardinal he only had to pay him an additional $750, in a couple of days, presumably when he sold the contraband.

The defendant got back into his vehicle and drove out of the lot followed by Officer Ryan Frederick and Trooper George Pitts. The officers lost sight of the defendant, but about forty-five minutes later, they saw the defendant's 2001 Mazda parked

in front of room 9 at the Chimney Mirror Motel.[2] Police checked the guest register at the motel on January 18, 2002, and confirmed that the defendant had rented room 9 for two weeks.

On January 17, 2002, the police had Cardinal participate in a "controlled delivery" of the $750 he owed the defendant. On that date, Cardinal paged the defendant at about 8:30 P.M. The defendant called back a few minutes later and said he was at Heather Alexander's house with the children. Although the defendant initially said he could get Cardinal more cocaine in about an hour, after further conversation he said he would be right over. When the defendant arrived in his white Mazda shortly thereafter, the affiant, Sergeant Foley, was hiding inside Cardinal's home. Foley heard the two men talking about Cardinal having purportedly sold the cocaine for which he was now paying and about making another cocaine deal the following Saturday. The defendant was observed leaving the driveway and traveling west on Route 2.

On January 22, 2001, at approximately 12:30 A.M., in the Cumberland Farms store on Main Street in Williamstown, two Williamstown police officers saw the defendant meet briefly with a man known to them as a crack cocaine addict and heard them discuss the sale of a videocassette recorder. The officers later saw each of the men's vehicles in the parking lot of a nearby video store. As the officers entered the parking lot, the defendant drove out in the white Mazda and pulled into the Chimney Mirror Motel parking lot, across the street.

b. *Discussion.* "[T]he nexus between the items to be seized and the place to be searched need not be based on direct observation." *Commonwealth* v. *Cinelli*, 389 Mass. at 213. "The nexus may be found in 'the type of crime, the nature of the missing items, the extent of the suspect's opportunity for concealment, and normal inferences as to where a criminal would be likely to hide' " the drugs he sells. *Ibid.*, quoting from *United States* v. *Lucarz*, 430 F.2d 1051, 1055 (9th Cir. 1970).

In the case at bar, the defendant concedes, as he did at the suppression hearing, that the information in the affidavit sup-

---

[2]Absent from the affidavit is any descriptive information regarding the motor vehicle the defendant drove to the River Street package store to meet Cardinal.

plies probable cause to believe that drugs would be found in the apartment located at 49 Arnold Place. He argues, however, that there are no facts upon which such a conclusion could be drawn in relation to the motel room.[3]

The relevant information culled from the affidavit regarding this inquiry is as follows. On January 12, 2002, the defendant had a fight with his girlfriend and left her home; he then rented a motel room. On January 18 the police went to the Chimney Mirror Motel in Williamstown and confirmed that the defendant had rented room 9 for two weeks, beginning approximately January 13. The defendant called Cardinal from this location on or about January 14, 2002. On January 15 Cardinal made a controlled buy from the defendant on River Street in North Adams. When the sale was complete, the police saw the defendant drive toward Williamstown, and approximately forty-five minutes later police observed the 2001 Mazda in the front of room 9 at the Chimney Mirror Motel. On January 17 Cardinal paid the defendant $750; police surveillance confirmed that the defendant left the Chimney Mirror Motel, stopped briefly at 49 Arnold Place, and then traveled to Cardinal's home to collect the money. On January 22 police officers saw the defendant, who was driving the white Mazda, meet with a known cocaine addict in a parking lot in Williamstown. As the police entered the parking lot in their vehicle, both the defendant and the known cocaine addict left and the defendant returned to the Chimney Mirror Motel.

Given the information in the affidavit that established the defendant's decade-long history of using his place of residence as a base for his drug selling operation, it is reasonable to infer that he continued this well-established pattern of selling drugs from his residence when he moved into a motel on or about January 13, 2002. As the motion judge concluded, this inference is bolstered by the information in the affidavit that suggests that the defendant "left . . . that room to conduct his nefarious business, and returned to it shortly thereafter, establish[ing] a

---

[3]A subsequent search of the defendant's white Mazda, parked outside of his motel room door, turned up financial records indicative of drug dealing. The defendant makes no argument on appeal challenging the search of his automobile.

reasonable basis for believing that evidence of his crimes would be found in the room." Compare *Commonwealth* v. *O'Day*, 440 Mass. at 302-304 (despite the lack of any direct evidence linking the defendant's residence to his drug selling activity at local bars, additional information supplied by State troopers regarding activity at the defendant's home — e.g., brief visits to his home by numerous people, and observation of the defendant during two surveillances in which he was seen to go directly from his residence to the pub where he apparently engaged in drug transactions — and the reasonable inferences that could be drawn therefrom were sufficient to establish probable cause). Contrast *Commonwealth* v. *Olivares*, 30 Mass. App. Ct. 596, 599-601 (1991) (no specific information in affidavit tying defendant's residence to illegal drug transactions); *Commonwealth* v. *Laughlin*, 40 Mass. App. Ct. 926, 926-927 (1996) (affidavit established that defendant was a drug dealer, but did not connect drugs to his residence); *Commonwealth* v. *Chongarlides*, 52 Mass. App. Ct. 366, 370 (2001) (affidavit contained no evidence that the defendant had ever kept drugs at his residence).

2. *No-knock.* The defendant argues that the affidavit in support of the search warrant provided insufficient information to justify dispensing with the requirement that the police must knock and announce their presence before executing the warrant. He further argues that the police did not conduct a threshold reappraisal of the extant circumstances at the time they executed the warrant to determine whether the situation still justified use of a no-knock entry. After conducting an evidentiary hearing on the reappraisal issue, the motion judge denied the defendant's suppression motion. There was no error.

The knock and announce rule, requiring that police announce their presence and purpose, has long been a part of the common law in Massachusetts. *Commonwealth* v. *Cundriff*, 382 Mass. 137, 146 (1980), cert. denied, 451 U.S. 973 (1981). "The policies underlying it are (1) to decrease the potential for violence, (2) to protect privacy, and (3) to prevent unnecessary damage to homes." *Commonwealth* v. *Wornum*, 421 Mass. 220, 222 (1995), cert. denied, 517 U.S. 1214 (1996). A magistrate may permit a no-knock entry when the search warrant affidavit contains suf-

ficient information to establish "probable cause to believe that the officers' safety would be endangered or the evidence sought would be destroyed." *Commonwealth* v. *Ortega*, 441 Mass. 170, 176 (2004). *Commonwealth* v. *West*, 55 Mass. App. Ct. 467, 468 (2002).

In the instant case, the affidavit not only set forth the defendant's record of violent crimes, including a conviction for assault and battery on a police officer, but also provided information that the defendant had been seen in the possession of a handgun and a small machine gun. The affidavit also pointed out that a person in room 9 would have the ability to see police officers approaching the room and that the room itself was small and confined. Finally, the affidavit alleged that the defendant was selling small quantities of cocaine that could easily be destroyed by being swallowed or flushed down a toilet. The information was sufficient to justify the inclusion of a no-knock provision in the warrant. See *Commonwealth* v. *West*, 55 Mass. App. Ct. at 468-471.

Next, the defendant claims that even if the "no-knock" warrant were properly issued, a threshold reappraisal by the police at the time of execution would have belied the necessity to enter without notice. At the center of this dispute appears to be a disagreement over the representation in the affidavit that a person inside room 9 had a one hundred foot unobstructed view of the motel parking lot. Photographs produced by the defendant at the hearing suggested that the view was obstructed by an island of trees in the middle of the parking lot and bushes near the motel room door. The motion judge, however, properly could conclude (as he did) that the information in the affidavit that the defendant might be armed or that the drugs could be readily destroyed was not altered by the disputed testimony. Contrast *Commonwealth* v. *Jimenez*, 438 Mass. 213, 220, 222 (2002) (affidavit "contained no particular facts and circumstances suggesting that there might be weapons on the premises," and the most relevant concerns in the affidavit — the likelihood of being observed on approach and the delay to be encountered in breaking down the door — proved to be untrue; therefore a no-knock entry was no longer warranted).

Even if we were to conclude that none of the circumstances

described in the affidavit, or encountered by police upon the execution of the warrant, justified a no-knock entry, the police entry here does not entitle the defendant to the suppression of the evidence. See *Commonwealth* v. *Gomes*, 408 Mass. 43, 46 (1990) (suppression of evidence seized following a violation of the knock and announce rule is not automatic).

Led by Massachusetts State police Lieutenant Joseph Mc-Dyer, the police executed the search warrant at approximately 7:15 P.M. on January 22, 2002. The shades were pulled over the windows, but the police could see a light on in the room. Two teams of officers approached the front door of the motel room from two different directions, while another team of officers covered the back of the building. McDyer was one of two officers to arrive at the front door. The screen door was closed, but the inside door to the room was open. McDyer looked into the room through the screen door and saw the defendant sitting on the bed watching television. McDyer yelled, "Search warrant, police," and then went in through the unlocked screen door. The defendant was secured and the search of the room commenced.

By announcing their presence and purpose outside of the motel room, but while in view of the defendant, the police satisfied the requirement that they knock and announce their presence before executing a search warrant. Compare *Commonwealth* v. *Goggin*, 412 Mass. 200, 203 (1992) (the police did not force entry without appropriate identification and an announcement, and therefore satisfied the terms of the warrant, which did not authorize a no-knock entry). Moreover, even if the method of entry did not adhere perfectly to the knock and announce requirement, it was sufficient to satisfy its objectives. Accordingly, the evidence seized need not be suppressed. "If the policies underlying the rule are substantially fulfilled in the circumstances in which the police enter premises to be searched, evidence seized pursuant to a valid search warrant need not be suppressed, even if, as here, the police did not knock and announce their presence as they should have." *Commonwealth* v. *Wornum*, 421 Mass. at 222.

3. *Sufficiency of the evidence — heroin charge.* We reject the defendant's contention that the judge improperly denied his mo-

tion for a required finding of not guilty on the charge of possession with intent to distribute heroin. Among the many other drugs found in the defendant's motel room were seventy-one individually wrapped, unopened packages of heroin, weighing a total of 2.65 grams, as well as sixty heroin "user blowouts" and another thirty-six heroin "user blowouts" elsewhere in the motel room. Officer Frederick testified that "user blowouts" refer to "packets of heroin that have already been used, that are open and empty." He further testified that no heroin "seller blowouts" were found. Also found in the motel room was a box of plastic sandwich bags and two straws that would be used to snort heroin or cocaine. Police also found a digital scale, pager, cellular telephone, a charger, and more than $1,200 in the defendant's motel room. We agree with the Commonwealth that when the evidence is viewed in the light most favorable to the government, it permits the inference that the defendant operated a drug store from his motel room where a variety of narcotics, including heroin, could be acquired and consumed. See *Commonwealth* v. *Rugaber*, 369 Mass. 765, 770 (1976); *Commonwealth* v. *Sendele*, 18 Mass. App. Ct. 755, 758 (1984) ("[p]ossession of a large quantity of an illicit narcotic raises an inference of intent to distribute").

4. *Sufficiency of the evidence — gun charge.* Similarly, we find no merit in the defendant's claim that the judge improperly denied his motion for a required finding of not guilty on the charge of possession of a firearm during the commission of a felony. Where, as here, the evidence shows that the weapon and the ammunition were found in the bathroom of the motel room from which the defendant was selling a variety of illegal drugs, it permitted the inference that the defendant kept his handgun there to protect himself and his business. Cf. *Commonwealth* v. *Ierardi*, 17 Mass. App. Ct. 297, 302 (1983) (drugs and bullets found on defendant "could be reasonably linked together and associated with drug sales").

In addition, to the extent the defendant contends that the penalty-enhancement statute under which he was convicted, G. L. c. 265, § 18B, punishes only the *use* of a weapon during a felony, he is off the mark. In 1998, the statute was amended to penalize the "possession" of a weapon while in the commis-

sion of or attempted commission of a felony. See St. 1998, c. 180, § 56. Prior to its amendment, the statute required the "use[]" of a weapon to trigger the penalty enhancement provisions of the statute.

*Judgments affirmed.*