## COMMONWEALTH *vs.* JOSHUA G. STEGEMANN.

No. 05-P-738.

Berkshire. August 14, 2006. - February 22, 2007.

Present: LAURENCE, BROWN, & VUONO, JJ.

*Controlled Substances. Constitutional Law,* Search and seizure, Probable cause. *Search and Seizure,* Probable cause, Affidavit. *Probable Cause. Practice, Criminal,* Mistrial, Opening statement.

A trial court judge erred in denying a criminal defendant's motion to suppress evidence obtained during a search of the defendant's apartment, where the affidavit in support of the application for the warrant provided more than ample probable cause to arrest the defendant for ongoing drug dealing activity but did not contain sufficiently particularized information connecting the defendant's apartment to his illegal drug activities, other than the fact that he resided at those premises. [299-304] BROWN, J., concurring.

A criminal defendant failed to advance any argument in support of his claim that a trial judge erred in denying the defendant's motion for a mistrial, or to demonstrate any abuse of discretion or prejudice arising from that ruling. [304-307]

INDICTMENTS found and returned in the Superior Court Department on October 18, 2001.

A pretrial motion to suppress evidence was heard by *Daniel A. Ford,* J., and the cases were tried before *John A. Agostini,* J.

*Brian J. Kelly* for the defendant.

*Joseph A. Pieropan,* Assistant District Attorney, for the Commonwealth.

LAURENCE, J. On September 13, 2001, Pittsfield police officers executed a search warrant at the 8 Oak Street apartment of the defendant, Joshua Stegemann. They found no drugs but seized cash in excess of $21,000, as well as a brown leather jacket that Stegemann had received as payment for cocaine at a controlled purchase on September 7, 2001. They also discovered several bags of cocaine and "crack" cocaine (totaling over thirty-three

grams) hidden in the building's cellar (the door to which was unlocked by a key taken from Stegemann when he was arrested shortly before the search).[1] That same day, police executed a search warrant at the residence of Stegemann's eventual co-defendant, Franklin LaMountain, on South Mountain Road. Police there found, among other things, a small amount (.21 grams) of loose crack cocaine, a bag of marijuana, a large quantity of drug-related paraphernalia,[2] and a significant sum of cash.

Based on the evidence seized at his residence, as well as the evidence of Stegemann's September 7, 2001, sale of crack cocaine to a police informant in the presence of an undercover police officer, the defendant was indicted on one count of trafficking in cocaine (based on the drugs found in his cellar), one count of distribution of cocaine (based on the September 7 transaction), one count of possession of cocaine with intent to distribute (also based on the September 7 incident), three counts of school zone violation (related to each of the above-mentioned charges), one count of conspiracy to traffic in cocaine (with La-Mountain), and one count of possession of a Class E substance, steroids.

Stegemann filed a pretrial motion to suppress the evidence seized on September 13 from his person, his apartment, and the cellar, which was denied on October 31, 2002. The Commonwealth's motion for joinder of Stegemann's case with that of LaMountain was allowed over the defendant's opposition. Subsequent to the allowance of the motion for joinder, but prior to Stegemann's trial, LaMountain pleaded guilty to the substantive charges against him.[3] After a five-day jury trial, Stegemann was convicted on July 28, 2003, of all seven counts that were tried to the jury.[4]

Stegemann here argues that (1) the trial judge erred in deny-

---

[1]Police also discovered a pack of one hundred illegal steroid tablets hidden in the cellar.

[2]These included scales, razor blades, sandwich bags, scissors, tins, and other equipment used in the preparation of cocaine for distribution, many of which contained cocaine residue.

[3]Those charges were possession of cocaine with intent to distribute and possession of marijuana, based on the seizure of those substances and related paraphernalia at his apartment on September 13, 2001, as well as a correlative charge of conspiracy to traffick with Stegemann.

[4]The trial did not encompass the conspiracy charge against Stegemann,

ing his motion to suppress because the police lacked probable cause to search his residence, there being no nexus between the alleged illegal activity and his residence[5]; and (2) the judge also erred in denying his motion for a mistrial after the judge had unfairly prejudiced him by joining the substantive claims against him with those against LaMountain, thereby permitting the admission of evidence seized from LaMountain's residence in the case against Stegemann.

*Background.* 1. *The motion to suppress.* As always, we confine our review of the probable cause issue to the facts gleaned from the "four corners of the affidavit" supporting the warrant application for Stegemann's residence. *Commonwealth* v. *O'Day*, 440 Mass. 296, 297 (2003). That affidavit, dated September 13, 2001, by Pittsfield Detective Glenn Decker, set forth information garnered from several sources, including an unnamed reliable confidential informant; Kelly Carnute, an identified police informant and cocaine customer of Stegemann; and a controlled purchase from Stegemann that occurred at Carnute's residence.

The confidential informant (whose past information had led to at least ten convictions for drug-related offenses) reported to Decker that, on or about June 30, 2001, while in North Adams with friends, the informant witnessed a friend meet with and purchase crack cocaine from Stegemann.[6] The informant "engaged in conversation with Stegemann and the friend about

which was ultimately placed on file. After the jury verdicts were returned, a second offense hearing was held on July 28, 2005. Stegemann pleaded guilty to the counts of distribution of cocaine and possession with intent to distribute cocaine, both as second offenses, although he preserved his right to appeal the underlying portions of those counts, along with his appellate rights as to his convictions.

[5]Stegemann also asserts that the trial judge erred in denying his motion to suppress because (1) the information provided by the confidential informant failed to satisfy the *Aguilar-Spinelli* test (see *Aguilar* v. *Texas*, 378 U.S. 108 [1964]; *Spinelli* v. *United States*, 393 U.S. 410 [1967]); (2) the police exceeded the scope of the warrant by searching the cellar of his residence (the warrant having made no reference to the existence of a cellar); and (3) the police performed an illegal search of several locked safes and containers located in his apartment, without obtaining a fresh search warrant. We need not address the merits of these arguments (except to the extent discussed in note 22, *infra*), since we hold that the police lacked probable cause for the underlying search of Stegemann's residence.

[6]The affidavit did not specify when the confidential informant provided this information. Presumably, the informant spoke with police sometime after June

the sale . . . [and] also witnessed Stegemann conduct a second purchase [*sic*] with a white male." The informant mentioned that Stegemann drove to the location of the sales in a "green Jeep Cherokee type vehicle."[7]

Kelly Carnute was an admitted crack cocaine addict who supported her habit by shoplifting, by lending her car to drug dealers, and by allowing them, at times, the use of her apartment to "cook" crack cocaine (i.e., to process powder cocaine into solid crack pieces). On August 28, 2001, Carnute was arrested by Pittsfield police for shoplifting. After being advised of her Miranda rights, Carnute requested to speak with Decker, whom she had known for many years. On September 6, 2001, Carnute met with Decker and other officers and gave a detailed statement regarding Stegemann. She reported that Stegemann and his partner, LaMountain, were her current crack cocaine suppliers.[8] She had known Stegemann for approximately four years. He began supplying Carnute with cocaine one year prior to his March, 1998, arrest for trafficking in cocaine.[9] During that year, Carnute permitted Stegemann to cook crack cocaine in her apartment. Shortly after his early release from prison in March, 2001, Stegemann resumed supplying Carnute with crack cocaine, telling her that "he needed crack cocaine customers."[10] He also gave Carnute's oldest daughter approximately two pounds of marijuana to sell. On another occasion he stored approximately four ounces of cocaine in the daughter's apartment.

The affidavit particularly recounted that:

> "Carnute buys or receives cocaine from Stegemann or La-Mountain or both on almost a daily basis for the past several months. . . . On many occasions Carnute will place a crack order with Stegemann and LaMountain will

---

30, 2001, but prior to September 13, 2001 (the date the affidavit was prepared).

[7]At the time, Stegemann had a green Ford Explorer sport utility vehicle, which, the affidavit notes, is easily mistaken for a green Jeep Cherokee.

[8]The Commonwealth asserted at trial that LaMountain was a "runner" for Stegemann, who headed their cocaine operation.

[9]He was convicted of trafficking in January, 1999, and sentenced to from three to five years in State prison.

[10]In April, 2001, Stegemann moved into an apartment at 8 Oak Street in Pittsfield, where he was residing at the time Carnute gave her statement. She had looked at the apartment with Stegemann before he moved in.

later arrive at her apartment and complete the sale. On many occasions LaMountain told Carnute that he had to go to his house before making his delivery to her. On another occasion Stegemann was in the process of cooking a large quantity of cocaine in his apartment on Oak Street when his parole officer arrived . . . [but he] never discovered what Stegemann was doing . . . ."

Both Stegemann and LaMountain would request that Carnute shoplift specific items to exchange with them for crack cocaine.[11] Recently, Stegemann had asked Carnute to steal a certain brown leather jacket from a store, but she had not attempted to shoplift the jacket because it had a security tag attached to it. Carnute also told police that Stegemann and LaMountain drove rental cars to deliver the cocaine and that they utilized telephones and pagers to conduct their business.

On September 7, 2001, Carnute met with undercover Officer Patricia Hill[12] of the Greenfield police department in order to assist the police in arranging a controlled buy from Stegemann.[13] Hill and Carnute went to the store to purchase the brown leather jacket that Stegemann had desired. They then drove to Carnute's residence at 48 Hamlin Street, Pittsfield, where Carnute paged Stegemann in Hill's presence. Shortly thereafter, when Stegemann returned the call, Carnute informed him that "she and a friend [had] stole[n] the jacket for him." Stegemann responded that he was in "North Adams and would be at her [Carnute's] apartment as soon as he could." Upon Stegemann's arrival, Carnute introduced Hill as an old friend. "During their conversations Stegemann told them how busy he had been that day and commented that he did not have a chance to count his money." Stegemann then removed a large sum of cash from his pocket, which Carnute estimated to be at least $5,000. Carnute informed Stegemann that Hill knew how to remove security tags from clothing and had assisted her in shoplifting the jacket

---

[11]Carnute would receive cocaine worth half the retail price of the items she stole.

[12]Decker's affidavit referred to her by her married surname, Hill, although at the time of trial she was called Patricia West.

[13]Officer Hill had worked with the Berkshire County drug task force on several prior occasions.

from the store. Stegemann expressed his approval, and the three ate dinner together.

After dinner, Hill inquired whether she could continue to steal items for Stegemann in exchange for cocaine, to which he affirmatively responded. Carnute asked Stegemann for one hundred dollars' worth of cocaine in exchange for the brown leather jacket that she had supposedly stolen for him. He offered instead to forgive a $120 debt Carnute owed to LaMountain for cocaine, but Carnute replied that she "wanted to keep the deals separate." Stegemann agreed and retrieved from the pocket of his pants a bag of crack cocaine and a bag of powder cocaine. The bag of crack cocaine contained at least ten individually packaged pieces of crack. Stegemann left three of the packages of crack cocaine on the kitchen table for Carnute and Hill and returned the remaining bags to his pocket. Police surveillants subsequently observed the vehicle Stegemann had used to travel to Carnute's apartment parked in front of his 8 Oak Street residence soon after his sale to Carnute and Hill.

On September 11, 2001, Carnute reported to Decker that both Stegemann and LaMountain had come to her apartment on the evening of September 7, 2001, and that on September 8, 2001, LaMountain again came to her apartment and supplied her with fifty dollars' worth of crack cocaine.

Based on the foregoing information, Decker concluded that "probable cause exists" to believe that Stegemann and LaMountain "are powder and crack cocaine dealers working together in Berkshire County." He summarized the highlights of his investigation as follows:

> "That the men [Stegemann and LaMountain] deliver cocaine to their customers utilizing rental vehicles. That the men have delivered cocaine, either individually or together, to Carnute on almost a daily basis since shortly after Stegemann's release from prison . . . . LaMountain himself has told Carnute on several occasions that he had to go to his house just prior to cocaine sales to her . . . . At least Stegemann also conducts business in North Adams, Ma. Stegemann cooks powder cocaine into crack cocaine that is then sold by the men. The men exchange their product for either cash or stolen goods."

2. *The joinder.* On March 12, 2003, a motion judge conducted a hearing on the Commonwealth's motion for joinder of the trial of the indictments against Stegemann and LaMountain[14] under a "co-venturer" theory, on the ground that evidence would be introduced at trial, admissible against both defendants, from several witnesses who would testify to purchasing drugs from the two defendants, both separately and together, over a period of six months prior to the September 7, 2001, controlled purchase. Additionally, Carnute would testify that Stegemann offered to "trade off" the debt she owed to LaMountain in exchange for the stolen leather jacket, supporting their association as joint venturers.

On March 21, 2003, the motion judge allowed joinder of the substantive charges against Stegemann and LaMountain,[15] but left open the possibility that the trial judge could revisit the issue. In so ruling, the judge stated,

> "What complicates matters, at least as I see it, is that the instant offenses charge the [d]efendants individually with separate controlled substance offenses. Yet the evidence of each defendant's intent to distribute on the dates in question could be proven by his previous participation in a joint venture to do so. I emphasize 'could,' because, as noted at the outset of this decision, the Commonwealth's proffer was far from detailed, and hence, once examined more carefully, might fail admissibility test for more than one reason."

Subsequent to the allowance of the motion for joinder, but prior to Stegemann's trial, LaMountain pleaded guilty to his substantive charges. After the Commonwealth's opening statement, which mentioned the evidence seized from LaMountain's residence, Stegemann's counsel moved for a mistrial. The judge denied the motion, and defense counsel asserted a continuing objection to the use of such evidence against Stegemann. Stege-

---

[14]The Commonwealth asserted that Stegemann and LaMountain should be tried together but that the substantive charges against both should be severed from the conspiracy charges against them. Both defendants contended that they should be tried separately.

[15]As noted earlier, the trial did not involve the conspiracy indictments, and the conspiracy charge against Stegemann was thereafter filed.

mann here argues that the Commonwealth should have been precluded from proceeding on the basis of such a joint venture strategy at trial, in light of the fact that it refrained from requesting the judge to give a joint venture instruction to the jury.[16]

*Discussion.* 1. *The motion to suppress.* Stegemann argues that the affidavit in support of the application for the warrant did not establish probable cause for the search of his residence. Specifically, he contends that no witness mentioned in the affidavit personally observed any drugs or drug-related activity at his apartment, and that the only reasonable inference to be drawn from the affidavit is that he stored his drugs and conducted his business at locations other than his home.

In evaluating his argument, "our inquiry as to the sufficiency of the search warrant application always begins and ends with the 'four corners of the affidavit.' " *Commonwealth* v. *O'Day*, 440 Mass. at 297, quoting from *Commonwealth* v. *Villella*, 39 Mass. App. Ct. 426, 428 (1995). The affidavit in its entirety must present a "substantial basis" to conclude that drugs and drug paraphernalia will be found in the defendant's residence. *Commonwealth* v. *Donahue*, 430 Mass. 710, 715 (2000). We are constrained to agree with Stegemann that the Commonwealth's affidavit failed to present such a substantial basis or to permit a determination that drugs and related paraphernalia and records would probably be located at Stegemann's residence. In short, probable cause did not exist for the issuance of the warrant for the search of Stegemann's apartment.

"In order to establish probable cause, an affidavit must contain sufficient information for an issuing magistrate to determine that the items sought are related to the criminal activity under investigation, and that the items reasonably may be expected to be located in the place to be searched at the time the warrant issues." *Commonwealth* v. *Rodriguez*, 49 Mass. App. Ct. 664, 667 (2000). "Strong reason to suspect [that contraband will be found there] is not adequate." *Commonwealth* v. *Upton*, 394

---

[16]The Commonwealth countered that the jury did not have to be convinced that Stegemann and LaMountain were joint venturers in order to convict Stegemann but that evidence of the joint enterprise was still relevant and admissible on the issue of Stegemann's intent to distribute the seven bags of cocaine he continued to possess after providing Carnute and Hill with three bags on September 7, 2001.

Mass. 363, 370 (1985). *Commonwealth* v. *Jean-Charles*, 398
Mass. 752, 757 (1986). "[E]stablishment of probable cause to
believe that 'a person is guilty of a crime does not necessarily
constitute probable cause to search the person's residence.' "[17]
*Commonwealth* v. *Olivares*, 30 Mass. App. Ct. 596, 600 (1991),
quoting from *Commonwealth* v. *Cinelli*, 389 Mass. 197, 213, cert.
denied, 464 U.S. 860 (1983). However, "[t]he connection
between the items to be seized and the place to be searched does
not have to be based on direct observations; it may be found by
looking at the type of crime, the nature of the items, the suspect's
opportunity to conceal items, and inferences as to where the
items are likely to be hidden." *Ibid.*, citing *Commonwealth* v.
*Cinelli*, *supra* at 213. See *Commonwealth* v. *Wright*, 15 Mass.
App. Ct. 245, 250-251 (1983).

While Decker's affidavit provided more than ample probable
cause to have arrested Stegemann for ongoing drug dealing
activity, it did not contain sufficiently particularized information
connecting Stegemann's apartment to his illegal drug activities,
other than the fact that he resided at those premises. Based on
the affidavit, Stegemann and LaMountain could certainly be
deemed joint venturers in distributing and trafficking in cocaine,
utilizing the usual implements of the trade (cellular telephones,
pagers, rental cars, etc.) to conduct their business. Carnute
bought or received cocaine from Stegemann, LaMountain, or
both on a daily basis for several months prior to the search. On
many occasions, when Carnute placed an order for cocaine with
Stegemann, LaMountain would appear at *her* residence to

---

[17]The Commonwealth relies on the proposition set forth in *Commonwealth*
v. *Singer*, 29 Mass. App. Ct. 708, 715 (1991), that "[i]t was reasonable to as-
sume that drugs, drug paraphernalia, and money, the items specified in the
warrant and seized, would be located in the residence of a person engaged in
drug transactions." That reliance is, however, misplaced, because the informa-
tion gleaned from the "four corners of the affidavit" here leads to the prob-
able conclusion that Stegemann's drug "stash" and base of operations were
not at but rather outside of his residence. *Singer* is also distinguishable from
the present circumstances because the affiant there observed "individuals
known to him to be involved in cocaine dealing" enter the defendant's apart-
ment building "and leave within a few minutes, thus suggesting a drug
operation." *Id.* at 714-715. Compare *Commonwealth* v. *O'Day*, *supra* at 299-
300, 302-303 (many brief visits to defendant's residence). By contrast, no
such police corroboration, nor any observations reliably linking Stegemann's
residence and his drug dealing activities, were provided in Decker's affidavit.

consummate the transaction. On many other occasions, "La-Mountain himself . . . told Carnute that he had to go to *his* [i.e., LaMountain's] house just prior to [making] cocaine sales to her" (emphasis added).

The affidavit is nonetheless devoid of reliably specific information linking *Stegemann's residence* to any of the described drug dealing activity. Instead, the affidavit merely reflects Stegemann consummating drug transactions in North Adams[18] or at his customers' residences (as evidenced by the controlled purchase and all other purchases mentioned by Carnute taking place at her apartment). The only rational inferences one can draw from the facts recited in the affidavit are that the drugs were stored, and perhaps prepared,[19] at either LaMountain's or clients' residences, or in Stegemann's vehicle.[20]

The Commonwealth advances two unpersuasive arguments in an effort to salvage its search and seizure. First, it claims prob-

---

[18]The affidavit states that "[a]t least Stegemann also conducts business in North Adams, Ma." The confidential informant observed Stegemann conduct at least one cocaine transaction in North Adams. In addition, Stegemann himself told Carnute that he was in North Adams prior to his arrival at her apartment for the controlled purchase. We assume the confidential informant would have informed Decker of the fact had the witnessed sale occurred at Stegemann's residence.

[19]The affidavit mentions Stegemann having once cooked cocaine in Carnute's apartment sometime in 1998.

[20]The affidavit states that Stegemann stored his drugs outside his residence in the past, e.g., in Carnute's and her daughter's apartments as well as, inferentially, at LaMountain's. Further, according to the affidavit, Stegemann was convicted in January, 1999, of trafficking in cocaine. His arrest had been the result of another ongoing drug investigation. Police observed Stegemann drive into the driveway at his then residence, enter the building for a short time, and then return to his vehicle. The officers followed Stegemann and activated their emergency lights. He led police on a brief chase, during which they observed him throw twenty-four bags of drugs from the vehicle before stopping. A search warrant was thereafter obtained for Stegemann's apartment, where only cash and some packaging materials were found; however, police discovered 477 grams of powder cocaine, 71 grams of crack cocaine, and a digital scale in his vehicle parked in the backyard of his apartment house. All of the evidence seized pursuant to the warrant on that occasion was suppressed on Stegemann's motion (for reasons not appearing in the instant record), but the incident did indicate that Stegemann's residence itself was not used as a base for storing his drugs. Contrast *Commonwealth* v. *Eller*, 66 Mass. App. Ct. 564, 570-571 (2006) (police were aware of defendant's decade-long history of using his residence as base for selling drugs, a pattern corroborated by recent police surveillance).

able cause to search Stegemann's residence existed because, as set forth in the affidavit, police surveillance "has shown Stegemann to drive directly to his 8 Oak Street apartment moments after his sale to Carnute and Officer Hill." The fact that Stegemann stopped at his residence — once, and then only *after* making a sale — fails logically to support any reasonable inferences justifying the issuance of a warrant to search that residence on the theory that his drug stash was probably there. Compare *Commonwealth* v. *Smith*, 57 Mass. App. Ct. 907, 908 (2003) (police observation of defendant driving one day from home to drug sale and, on another occasion, to home after drug sale was, without more, insufficient to link defendant's residence to drug activity). Contrast *Commonwealth* v. *O'Day*, 440 Mass. at 302-304 (police surveillance showed defendant going directly to drug sales from his residence); *Commonwealth* v. *Eller*, 66 Mass. App. Ct. 564, 570-571 (2006) (same); *Commonwealth* v. *Gallagher*, *ante* 56, 59-60 (2007) (same).[21]

The Commonwealth also repeatedly asserts the significance of a single fact: that on one occasion Stegemann "was in the process of cooking a large quantity of cocaine in his apartment on Oak Street." The affidavit does not, however, indicate whether Stegemann "cooked" cocaine on that occasion for distribution or for his personal consumption. More significantly, it fails to state *when* he allegedly cooked the cocaine — it could have been as long as five months earlier. See *Sgro* v. *United States*, 287 U.S. 206, 210-211 (1932) (facts supporting probable cause cannot be stale and must be "closely related to the time of the issue of the warrant"). See also *Commonwealth* v. *Reddington*, 395 Mass. 315, 322-323 (1985) (six month old tip about once seeing drugs in defendant's house stale and insufficient to establish probable cause).

The affidavit further fails to explain how Carnute knew of this "cooking" incident — whether she observed it personally

---

[21]The facts that Stegemann's 1999 brush with the police involved drugs found in his car; that he arrived at the controlled purchase on September 7, 2001, from North Adams; and that Carnute's purchase orders to Stegemann were often filled by LaMountain, who frequently had to pick up the drugs at his own home before making delivery, all support the inference that Stegemann stored his contraband in his vehicles or at LaMountain's residence rather than at his own apartment.

or whether Stegemann or someone else subsequently mentioned it to her.[22] The information that Stegemann allegedly once cooked crack in his apartment at some undetermined time simply could not be deemed sufficiently reliable to support a probable cause finding to search that apartment.

Thus, while the affidavit clearly illustrates Stegemann's ongoing drug dealing, it does not come close to establishing a probable link between his residence and his drug enterprise. In particular, nothing in the affidavit suggests that drugs would be found in Stegemann's apartment six days after the controlled purchase that took place at Carnute's residence, rather than being stashed in his car, or at LaMountain's residence, or at the residence of one of his other customers. The instant circumstances are distinguishable from the cases in which police were able to corroborate their suspicions that the defendant stored drugs in his residence. See, e.g., *Commonwealth* v. *O'Day*, 440 Mass. at 302-304 (police conducted surveillance of defendant's residence and observed frequent brief visits to defendant's residence and defendant making drug deliveries from his residence); *Commonwealth* v. *Singer*, 29 Mass. App. Ct. 708, 714-715 (1991) (police corroboration through surveillance observing drug users visiting defendant's residences sufficient for probable cause). The present case is, rather, similar to those which "lack any detail linking the defendant's residence to drug activity: *Commonwealth* v. *Gauthier*, 425 Mass. 37, 40 (1997) (only information regarding defendant's home was that known drug dealer entered and departed residence); *Commonwealth* v. *Chongarlides*, 52 Mass. App. Ct. 366, 370 (2001) (nothing to explain why drugs would be at place searched other than place was presumed to be residence of defendant, who three days before used heroin at another location); *Commonwealth* v.

---

[22]This stale information thus also fails the first prong of the *Aguilar-Spinelli* test (see note 5, *supra*; *Commonwealth* v. *Upton*, 394 Mass. 363, 374-376 [1985]), since the affidavit does not specify Carnute's basis of knowledge for stating that Stegemann cooked cocaine in his apartment on one occasion. The affidavit does not attest that she obtained this information through personal observation and is not so detailed and precise as to permit the inference of firsthand knowledge. Further, although this incident is contained in Decker's affidavit under the section of information attributed to Carnute, the affidavit provides no basis for Carnute's ever having been in Stegemann's apartment except on one occasion, *before* he moved into it.

*Laughlin*, 40 Mass. App. Ct. 926, 927 (1996) (no evidence in affidavit other than defendant was drug dealer who lived at residence searched) . . . . [See also] *Commonwealth* v. *Smith*, 57 Mass. App. Ct. 907, 908 (2003) (police observations of defendant driving one day from home to drug sale and, on another occasion, to home after drug sale [insufficient] without more); *Commonwealth* v. *Olivares*, 30 Mass. App. Ct. 596 (1991) (no specific information in affidavit tying defendant's residence to illegal drug transactions, other than that he lived at those premises)." *Commonwealth* v. *O'Day*, 440 Mass. at 304.

Consequently, the police lacked probable cause to search Stegemann's residence, and his motion to suppress the evidence seized therefrom on September 13, 2001, should have been allowed. The prosecutor's lack of that evidence requires reversal of Stegemann's trafficking conviction, the associated school zone conviction, and the conviction for possessing steroids. The failure of the affidavit and subsequent search does not, however, affect the validity of his convictions arising from the September 7, 2001, controlled purchase in Carnute's apartment, as discussed in the following section.

2. *Denial of motion for mistrial.* Stegemann argues that the trial judge erred in denying his motion for a mistrial (made after the prosecutor delivered his opening statement to the jury) on the ground that the judge thereby compounded his earlier error in allowing the joinder of his case for trial with that of his co-defendant, LaMountain (who had pleaded guilty just before Stegemann's trial). His theory is that the purpose of the prosecutor's mentioning the Commonwealth's intended introduction of evidence seized from LaMountain's residence on September 13, 2001 — during a search authorized by the same warrant we have above found wanting against Stegemann but which was not challenged by LaMountain — was solely to prejudice the jury against Stegemann, since the LaMountain evidence was (he contends) unnecessary to the Commonwealth's case against him.

We reject Stegemann's contention for the reasons, if no other, that (a) he has failed to provide a single relevant precedent or other authority, or to present a coherent legal argument, in support of his theories of judicial error and consequent prejudice

(in violation of his obligation under Mass.R.Civ.P. 16[a][4], as amended, 367 Mass. 921 [1975]. See *Commonwealth* v. *Gordon*, 407 Mass. 340, 350 [1990] [involving denial of defendant's motion for mistrial])[23]; and (b) he has not demonstrated any abuse of the broad discretion with which trial judges are invested when ruling on motions for mistrial, see *Commonwealth* v. *Amirault*, 404 Mass. 221, 232 (1989); *Commonwealth* v. *Riberio*, 49 Mass. App. Ct. 7, 10-11 (2000), a particularly heavy burden that Stegemann has failed to address, much less discharge.[24]

Furthermore, the judge's ruling was not improper on this record. A prosecutor may generally "state anything in his opening statement that he expects to be able to prove by evidence," *Commonwealth* v. *Cohen*, 412 Mass. 375, 382 (1992), including facts that would have to be proved by inferences. *Commonwealth* v. *Johnson*, 429 Mass. 745, 748 (1999). Proof of Stegemann's intent to distribute was an essential element of the possession count against him based on the September 7, 2001, incident in Carnute's apartment. See G. L. c. 94C, § 32A(*c*). The evidence (as testified to by Carnute and another user witness, Ronald Janis) of Stegemann's having regularly dealt drugs in concert with LaMountain, over the period of six months prior to their arrests, was relevant to and probative of that intent. Compare *Commonwealth* v. *Smith*, 58 Mass. App. Ct. 166, 175 (2003), rev'd on other grounds, 543 U.S. 462 (2005). Stege-

[23]Stegemann's conclusory contention is that by admitting the LaMountain evidence, the judge effectively, and in violation of Mass.R.Crim.P. 9(e), 378 Mass. 859 (1979), joined for trial both his substantive charges and a pending conspiracy (with LaMountain) count against him in connection with the trafficking indictment. Nowhere in the trial record before us, however, is there a reference, or even allusion, to any pending conspiracy charge against him (which was in fact filed), and Stegemann offers no legal support or meaningful argument for his bald assertions that the judge "turned his substantive case into a conspiracy case" and thereby caused prejudicial error.

[24]"In order to find an abuse of discretion, 'it is necessary to decide that no conscientious judge, acting intelligently, could honestly have taken the view expressed by him.' " *Commonwealth* v. *Jaime*, 433 Mass. 575, 579 (2001), quoting from *Commonwealth* v. *Medeiros*, 395 Mass. 336, 351 (1985). *Commonwealth* v. *Anderson*, 445 Mass. 195, 209 (2005). Stegemann's implicit attack on the judge's joinder decision suffers from the same fundamental defect, since such matters are within the sound discretion of the trial judge and can be successfully challenged only if a defendant can show that joinder prevented his receiving a fair trial. See *Commonwealth* v. *Moran*, 387 Mass. 644, 659 (1982).

mann has additionally failed to come to grips with (let alone satisfy) his heavy burden of proving abuse of discretion and palpable error by the judge in having implicitly determined that the probative value of such relevant evidence outweighed any potential prejudice. See *Commonwealth* v. *Leonard,* 428 Mass. 782, 786 (1999); *Commonwealth* v. *Gollman,* 436 Mass. 111, 113-115 (2002); *Commonwealth* v. *Delong,* 60 Mass. App. Ct. 528, 535-536 (2004).

Stegemann's conclusory claim of prejudice from the judge's allowance of the LaMountain evidence is also unsupported by the record. First, his counsel failed to take advantage of the court's expressed willingness to revisit the ruling the following day, and also failed to request cautionary or curative instructions of any sort.[25] Moreover, in closing the prosecutor made only one unspecific reference to the LaMountain evidence (regarding the extensive drug paraphernalia found there, none of which revealed a tie to Stegemann); did not mention it in connection with the most serious charge, trafficking (for which the prosecutor relied entirely on the quantity of cocaine found in Stegemann's cellar); and relied solely on the testimony of Carnute and undercover officer Hill to prove the September 7, 2001, charges (distribution of cocaine, possession of cocaine with intent to distribute, and associated school zone violations).[26]

Given the strength of the Commonwealth's case on the four counts against him arising out of the controlled purchase (and attendant circumstances) on September 7, 2001 — including the eyewitness testimony of a trained police officer experienced in

---

[25]Cf. *Commonwealth* v. *Toro,* 395 Mass. 354, 359-360 (1985); *Commonwealth* v. *Perry,* 15 Mass. App. Ct. 932, 933 (1983) (both rejecting appellate challenges to prosecutorial arguments claimed to have been prejudicial when defendant failed to request such instructions). The judge, moreover, cautioned the jury on multiple occasions that the attorneys' arguments were not evidence and could not be considered in determining the defendant's guilt. The judge's strong and repeated instructions to the jury to base their verdicts solely on the evidence and to exclude emotion or sympathy for either side from their deliberations (which we presume the jury obeyed) also undercut Stegemann's conjectural prejudice argument. Compare *Commonwealth* v. *Depradine,* 42 Mass. App. Ct. 401, 408-409 (1997). See *Commonwealth* v. *Riberio,* 49 Mass. App. Ct. at 10-11.

[26]Stegemann in fact concedes that all of the elements of the indictments against him could be established without any of the LaMountain evidence (assuming the validity of the search of his cellar).

narcotics investigations (which the prosecutor particularly stressed in his closing) — we think it implausible and entirely speculative to infer, as Stegemann urges, that without the scattered references to the LaMountain evidence the jury would not have convicted him of the September 7 charges.

*Conclusion.* For the reasons set forth above, the judgments on the indictments charging trafficking in cocaine and possessing steroids, and for doing so in a school zone, are reversed. The judgments on the indictments charging possession of cocaine with intent to distribute, second offense, and distribution of cocaine, second offense, are affirmed.

*So ordered.*

Brown, J. (concurring). Although this is a close case, I believe it falls within the reasoning of a narrow line of cases, see *Commonwealth* v. *O'Day,* 440 Mass. 296, 304 (2003) (collecting cases), and is readily distinguishable from the peculiar circumstances presented in *Commonwealth* v. *Eller,* 66 Mass. App. Ct. 564, 570-571 (2006).