## COMMONWEALTH vs. GREGORY A. RABB.

No. 06-P-1058.

Plymouth. April 11, 2007. - September 24, 2007.

Present: CYPHER, DOERFER, & KATZMANN, JJ.[1]

*Controlled Substances. Estoppel. Collateral Estoppel. Constitutional Law,* Search and seizure. *Search and Seizure,* Warrant, Affidavit. *Evidence,* Constructive possession.

The doctrine of collateral estoppel did not preclude a criminal defendant from relitigating the validity of a search warrant following the denial of a codefendant's motion to suppress evidence found during a search conducted pursuant to the warrant, where the defendant was not a party to the codefendant's motion and did not have such a close identity or mutuality of interests with the codefendant that it could be said that the codefendant's litigation of the motion to suppress accorded the defendant a full and fair opportunity to litigate the matter. [196-199]

A Superior Court judge properly denied the criminal defendant's pretrial motion to suppress evidence obtained during a search conducted pursuant to a warrant, where the affidavit accompanying the application for the warrant set forth sufficient facts to establish a confidential informant's basis of knowledge and credibility, and where, even assuming that the informant lacked a sufficient basis of knowledge, there was sufficient compensating corroboration in the affidavit [204]; further, where the affidavit established that a coventurer with the defendant could have had a basis of knowledge for statements he made to the informant relating to the defendant, the use of those statements in the affidavit was permissible [205]; finally, the affidavit set forth sufficient facts to permit the reasonable inference that the defendant arranged drug deals from the motel room that was the object of the search, and that the defendant likely stored in the motel room drugs, implements or records related to the distribution of drugs, or fruits (such as monies) derived from drug transactions [205-208].

At the trial of an indictment charging the defendant with trafficking in cocaine in an amount of one hundred grams or more, but less than 200 grams, the evidence was sufficient to permit the inference that the defendant intended to exercise dominion and control over all the drugs found in a motel room, where the drugs were stored in common portions of the room (a wall

[1]The case was originally heard by a panel comprised of Justices Cypher, Doerfer, and Katzmann. Justice Doerfer participated in the deliberation on this case prior to his retirement. Following issuance of the panel's opinion and Justice Doerfer's retirement, the defendant filed a petition for rehearing. Justice Vuono was then substituted on the panel for Justice Doerfer and upon consideration of the petition for rehearing the new panel ordered revisions now incorporated in the opinion.

heater and a kitchen cabinet) and the defendant had paid for the room, where the room played a role in the defendant's warehouse-retail drug trafficking operation, where the defendant admitted that the larger "stash" of cocaine found was his, and where the defendant displayed an awareness of guilt for possession of all the cocaine. [208-210]

INDICTMENT found and returned in the Superior Court Department on May 2, 1994.

A pretrial motion to suppress evidence was considered by *Wendie I. Gershengorn*, J., and the case was tried before *Patrick F. Brady*, J.

Following review by the Supreme Judicial Court, 431 Mass. 123 (2000), a motion to file a late notice of appeal, filed on May 31, 2005, was allowed in the Appeals Court by *Laurence*, J.

*Carlo A. Obligato*, Committee for Public Counsel Services, for the defendant.

*Gail M. McKenna*, Assistant District Attorney, for the Commonwealth.

KATZMANN, J. A jury in Superior Court convicted the defendant of trafficking in cocaine in an amount of one hundred grams or more, but less than 200 grams. Claiming that the search warrant affidavit did not pass muster, and that the evidence was not sufficient to convict him of constructive possession, the defendant appeals. While we are unpersuaded by the Commonwealth's claim that offensive collateral estoppel bars the search warrant challenge, we determine that the motion to suppress was properly denied, and affirm the judgment of conviction.

The road to this appeal has been a long and winding one. On February 1, 1994, the Plymouth police applied for, received, and executed search warrants for 31 Seaview Street, Plymouth, and unit six of the Bay View Motel, Kingston, with each warrant based on the same affidavit. At the time of execution of the Seaview Street warrant, the defendant, Gregory A. Rabb, and one Maurice Wynn were among five men arrested. When the Bay View Motel room search warrant was executed, the police recovered two "stashes" in two different places — one bag of 82.05 grams of "crack" cocaine was inside a wall heater, and the other bag of 31.02 grams of crack cocaine was at the bottom of a Loops cereal box. They also found a walkie-talkie radio tuned to the same frequency as one found at Seaview Street. A grand

jury indicted the defendant for trafficking in cocaine in an amount of one hundred grams or more, but less than 200 grams, in violation of G. L. c. 94C, § 32E(*b*)(3). The defendant filed a motion to suppress evidence seized during the two searches, which was denied on March 22, 1996. Following a trial by jury, the defendant, as has been noted, was convicted as charged.[2]

On February 21, 1997, the trial judge allowed the defendant's motion for a required finding of not guilty and entered judgment for the defendant, setting aside the verdict. The judge agreed with the defendant that his plea of guilty in District Court to a charge of possession of cocaine with intent to distribute, prior to his trial of the trafficking indictment in Superior Court, barred prosecution of the indictment under double jeopardy principles. The Supreme Judicial Court subsequently vacated the judgment and reinstated the conviction. *Commonwealth* v. *Rabb*, 431 Mass. 123, 123-124 (2000). On February 3, 2005, following the defendant's surrender on an outstanding warrant, another Superior Court judge reimposed the defendant's sentence. On June 1, 2005, a single justice of this court allowed the defendant's motion to reinstate his direct appeal. After review, we affirm the order denying the motion to suppress as well as the order denying the motion for required finding of not guilty.

1. *Collateral estoppel.* While our primary inquiry is whether the affidavit accompanying the search warrant application established that the defendant's involvement in a cocaine distribution ring permitted an inference that he likely stored drugs or evidence relating to the distribution in his motel room, we must first address the Commonwealth's contention that the defendant is precluded by the doctrine of collateral estoppel from relitigating the validity of the search warrant. The Commonwealth's as-

---

[2]Wynn was also indicted for trafficking in cocaine of a net weight of one hundred grams or more but less than 200 grams. Wynn's motion to suppress the evidence seized at the Seaview Street address and the Bay View Motel room was denied. He was tried separately, and a jury convicted him of the lesser included offense of trafficking in cocaine of a net weight of more than twenty-eight grams but less than one hundred grams, and of possession of cocaine with intent to distribute. This court affirmed the order denying the motion to suppress and the judgments in an unpublished memorandum and order pursuant to our rule 1:28. *Commonwealth* v. *Wynn*, 44 Mass. App. Ct. 1114 (1998).

sertion arises from a Superior Court judge's denial (see note 2, *supra*) of a motion to suppress challenging the search warrant, filed by Maurice Wynn, a cohabitant of unit six of the Bay View Motel. The judge there denied Wynn's claim that the warrant failed to supply a sufficient nexus between the motel room and the drug-dealing activities. As has been noted, that denial was affirmed. *Commonwealth* v. *Wynn*, 44 Mass. App. Ct. 1114 (1998).

"Offensive collateral estoppel 'occurs when a plaintiff seeks to prevent a defendant from litigating issues which the defendant has previously litigated unsuccessfully in an action against another party.' " *Commonwealth* v. *Two Parcels of Land*, 48 Mass. App. Ct. 693, 697 (2000), quoting from *Whitehall Co.* v. *Barletta*, 404 Mass. 497, 501 n.9 (1989). As the Commonwealth notes, "[w]hether the common-law principle of offensive or non-mutual collateral estoppel can be asserted by the Commonwealth against a codefendant in a criminal case to preclude review of an issue is an unsettled issue." The doctrine of collateral estoppel, and its cousin, issue preclusion, have application to criminal cases. *Commonwealth* v. *Williams*, 431 Mass. 71, 74 (2000). It applies when the "issue of fact or law is actually litigated and determined by a valid and final judgment, . . . the determination is essential to the judgment," and the defendant had an opportunity to obtain review of the determination. *Commonwealth* v. *Rodriguez*, 443 Mass. 707, 710 (2005), quoting from *Cousineau* v. *Laramee*, 388 Mass. 859, 863 n.4 (1983). Moreover, it "usually applies only 'where there is mutuality of the parties.' " *Commonwealth* v. *Williams*, 431 Mass. at 74, quoting from *Commonwealth* v. *Benson*, 389 Mass. 473, 478 n.6, cert. denied, 464 U.S. 915 (1983). See *Commonwealth* v. *Rodriguez*, 443 Mass. at 710 ("Collateral estoppel usually involves the application of issue preclusion in a subsequent action of a different claim between the same parties"). " 'Fairness is the decisive consideration' in the use of offensive collateral estoppel." *Commonwealth* v. *Two Parcels of Land*, 48 Mass. App. Ct. at 698, quoting from *Smola* v. *Higgins*, 42 Mass. App. Ct. 724, 727 (1997). The court must be satisfied that the party to be estopped had a "full and fair opportunity to litigate the issue." *Brunson* v. *Wall*, 405 Mass. 446, 451 (1989),

quoting from *Fidler* v. *E.M. Parker Co.*, 394 Mass. 534, 541 (1985). The doctrine operates to protect the judicial system from redundant litigation, and to restrict or eliminate the possibility of conflicting results by different judges based upon the same facts and applicable law. At the same time, its application should "not . . . deprive a litigant of an adequate day in court." Restatement (Second) of Judgments § 27 comment c, at 252 (1982).

The defendant was not a party in *Commonwealth* v. *Wynn, supra.* While the Commonwealth concedes that the parties in *Wynn* are not the "same" as those in the present case, it asserts that due to their mutual interests in having the seized evidence suppressed, they are in privity. However, the Commonwealth cites to no cases permitting offensive collateral estoppel in Massachusetts criminal cases or, more on point, in a suppression context. We do not find the Commonwealth's argument here to be persuasive. A suppression hearing "is a critical stage of the prosecution which affects substantial rights of an accused person; the outcome of the hearing . . . may often determine the eventual outcome of conviction or acquittal." *Robinson* v. *Commonwealth*, 445 Mass. 280, 286 (2005), quoting from *United States* v. *Green*, 670 F.2d 1148, 1154 (D.C. Cir. 1981). During a suppression hearing, facts regarding a search are established, and its legality is determined. See *Robinson* v. *Commonwealth*, 445 Mass. at 286, citing *People* v. *Anderson*, 16 N.Y.2d. 282, 287-288 (1965). Because a suppression hearing is a "critical stage" under Mass. R.Crim.P. 18(a), 378 Mass. 887 (1979), a defendant has a right to be present at such a hearing, see *Robinson* v. *Commonwealth*, 445 Mass. at 285-286; Smith, Criminal Practice & Procedure § 1607 (2d ed. 1983), and is entitled to the effective assistance of counsel at it. See *United States* v. *Cronic*, 466 U.S. 648, 659 (1984); *Commonwealth* v. *Curtis*, 417 Mass. 619, 635 n.14 (1994). The importance of the suppression hearing is such that while a defendant may waive his right to be present at the hearing, that "does not imply waiver of . . . the right to the suppression hearing itself and the right to effective assistance of counsel at that hearing." *Commonwealth* v. *Robinson*, 445 Mass. at 288. The waiver of the right to be present is not readily presumed, and requires careful scrutiny by the judge.

These basic principles give context and perspective to the collateral estoppel claim before us, and inform our analysis. They contemplate protection of the defendant's interests in the critical stages of the criminal process, effective assistance of counsel, and, implicitly, the meaningful opportunity of the defendant to participate in the litigation of his defense. In criminal proceedings we emphasize that each defendant is entitled to individual consideration and to effective representation by individual counsel, and is further entitled to press litigation strategies with that counsel. There is no reason that these basic principles should not pertain to the litigation of a motion to suppress evidence. Moreover, even if we accepted the collateral estoppel argument in theory, as a matter of practical reality we would not conclude that the defendant and Wynn had such a close identity or mutuality of interests that it could be said that Wynn's litigation of the motion to suppress accorded the defendant a full and fair opportunity to litigate the matter. While each may have had the same goal — the suppression of the evidence found in the motel room — they differed in their alleged involvement in the cocaine distribution scheme, in the evidence attributed to each, and in their connection to the motel room. They may very well have differed in their knowledge of the facts, in their potential ability to assess the representations in the search warrant affidavit, and in their ability to suggest to counsel avenues of attack on that warrant.[3] In sum, the defendant should not be foreclosed from litigating the validity of the search warrant.

2. *Challenge to the search warrant for unit six of the Bay View Motel.* a. *Background.* Our review of the sufficiency of a search warrant affidavit "begins and ends with the 'four corners of the affidavit.' " *Commonwealth* v. *O'Day*, 440 Mass. 296, 297 (2003), quoting from *Commonwealth* v. *Villella*, 39 Mass. App. Ct. 426, 428 (1995). We summarize the facts recited in the affidavit by William Curtis, a Plymouth police department detective.[4]

---

[3]That the defendant's hearing was nonevidentiary — as is typical in consideration of motions to suppress physical evidence seized pursuant to a search warrant — does not diminish the strength of his individualized interest.

[4]At the time he applied for the warrant, Curtis was a twenty-year veteran, with thirteen years' experience in plain clothes narcotics investigation. He had attended a variety of narcotics training sessions.

In February, 1992, a search warrant was served at the residence of Heidi Smith, located at 31 Seaview Street,[5] Plymouth. During the search, one Toby Santos was arrested and subsequently charged with narcotics violations.

In January, 1993, Curtis spoke with an informant (C-1),[6] who told him that Santos and two other men were selling crack cocaine from Smith's apartment.[7] The two other men were both black, in their late teens or early twenties, and wore hats. All three men held the cocaine in their mouths and sold rocks of cocaine wrapped in clear plastic for twenty dollars. C-1 observed baseball bats and clubs lying around the apartment, which he believed were makeshift weapons, and that the rear door was barred with a two by four board. C-1 also stated that Santos and the other men requested that individuals park around the corner from the apartment to avoid suspicion. When the three ran out of cocaine, they would go into the back yard and return with more.

Curtis next spoke with C-1 in July, 1993. At this time, C-1 stated that Santos was no longer operating out of Smith's apartment, that Smith had begun selling cocaine herself, and that C-1 had observed sales by Smith within the last three days.

In October, 1993, Curtis spoke with a second informant (C-2).[8] C-2 informed Curtis that Smith was selling crack cocaine from her apartment, that C-2 had visited Smith's residence numerous times over the last three months, and that C-2 had been there within the last four days. During each visit, C-2 observed Smith selling crack cocaine to various unidentified parties.

Around this time, Curtis and another detective, one Flood, spoke with Smith's landlord. The landlord stated that he was concerned about the possibility of illegal activity in Smith's

[5]The affidavit sometimes states this address as Seaview Avenue. We see no significance in this inconsistency, and use Seaview Street throughout this opinion. We also note that the actual search warrant application lists 31 Seaview Street.

[6]Curtis described C-1 as a reliable informant, whose information had previously led to arrests, seizures of controlled substances, and court convictions.

[7]C-1 had visited the premises several times, including within forty-eight hours of the meeting with Detective Curtis. C-1 stated that not all three men were present during each visit.

[8]Curtis stated that C-2 was a reliable informant whose information had previously led to arrests, seizures of drugs, and court convictions.

apartment, and that during an earlier visit, he observed numerous people attempting to hide in the apartment, that the backdoor was barricaded, and that persons approaching the apartment left when they saw him. The landlord further stated that several tenants had expressed concerns to him regarding Smith's activities.

On December 3, 1993, Plymouth police executed a search warrant at 3 Forest Avenue, Plymouth, the residence of one Elaine Dickson. At that time, police arrested five suspects, including one Brendon Pittman. Pittman told police that he had gone to Dickson's house for drugs. Dickson told him she was sending someone to "Heidi's" for the drugs, and that "Heidi" lived on a hill on the street behind Dickson's house. Pittman had in fact taken the drugs once they were procured. Subsequent investigation by Curtis confirmed that Smith's house was on a hill behind Forest Avenue.

On December 7, 1993, Curtis again spoke with C-2. C-2 stated that Smith continued to sell crack cocaine from her apartment, that the crack cocaine was wrapped in clear plastic and sold for twenty dollars, that the apartment did not appear to have electrical service, and that he had visited the apartment within the last four days. Curtis also spoke with C-2 on December 14, 1993, at which time C-2 reported that Smith continued to sell cocaine at the same price and that clubs and knives were present on the floor of the apartment.

Around this time, Curtis again spoke with Smith's landlord. He reported that the tenants continued to complain about Smith's activities and that electrical service had been discontinued.

In the several months preceding this period, Curtis and Flood conducted "loose surveillance" of Smith's residence. The detectives observed numerous motor vehicles and subjects coming and going from the house, at all hours of the night. Several of the subjects were known to the detectives as cocaine users.

On December 15, 1993, Plymouth police executed a search warrant at Smith's apartment, during which an unspecified quantity of cocaine was seized. Police also arrested Smith, Richard Whiting, and the defendant at that time.[9] The defendant

---

[9]Police arrested Smith and Whiting for possession of a class B substance (crack cocaine).

had entered the apartment during the search and stated that he had come to visit Smith's dog. There is no indication what crimes the defendant was charged with when he was arrested on that date. Another individual, Richard Furtado, was present during the search, but was not charged with any crimes. Police also observed a walkie-talkie radio lying on Smith's kitchen table.

Curtis next spoke with C-2 on January 13, 1994. C-2 informed Curtis that a black male continued to sell cocaine from Smith's residence, that Smith and Furtado were both present during the transactions, and that the observed transaction had occurred within the previous four days.

On January 30, 1994, Curtis had a conversation with a third informant, C-3.[10] C-3 stated that he had visited Smith's apartment numerous times in the past several months, including once within the previous twenty-four hours, and that persons continued to sell cocaine from the apartment. C-3 further stated that the defendant was Smith's supplier and that he had seen the defendant drop off unspecified quantities of crack cocaine at the apartment. C-3 also stated that Furtado, whom he then believed to be living at 31 Seaview Street, had told him that the defendant was staying at the Bay View Motel in Kingston[11] and that Smith was in radio contact with the defendant by way of a walkie-talkie radio. When Smith needed more "product," she would contact the defendant at the Bay View Motel, and the defendant would then deliver the crack cocaine. C-3 further informed Curtis that the defendant often operated a blue motor vehicle, with a specified Massachusetts registration.[12] At night, the defendant often parked the motor vehicle on an adjacent corner, then proceeded on foot to the apartment.

In the middle of January, 1994, Curtis and Flood conducted a second "loose surveillance" of Smith's apartment. During that time they observed numerous motor vehicles from surrounding communities stop at the apartment. The occupants got out of their vehicles, entered the apartment, and then returned to their

---

[10] Curtis alleged that C-3 was a reliable informant whose information had previously led to arrests and seizures of controlled substances.

[11] Curtis's investigation indicated that Bay View Motel was within one-quarter mile of 31 Seaview Street.

[12] C-3 also stated that the motor vehicle was sometimes operated by another black male named Glenroy.

vehicles "within a couple of minutes." Curtis and Flood also observed the same blue motor vehicle mentioned by C-3 parked at or near the apartment. Further investigation into that motor vehicle revealed that it was a rental car. After speaking with an official of the car rental company that owned the vehicle, Curtis learned that an individual named Glenroy Durrant was renting it, that he had rented it since December 16, 1993, and that he had been paying cash for the rental cost (over $1,600). In addition, at the request of Curtis, the Kingston police learned from the Bay View Motel owner that the defendant often operated the motor vehicle and that he was staying at the Bay View Motel.

On February 1, 1994, Curtis spoke with C-2. C-2 informed Curtis that C-2 had been to Smith's apartment within the last twenty-four hours and had seen crack cocaine sold at the location, and that the crack cocaine had the same method of packaging and price as the last time C-2 had spoken to Curtis. C-2 also heard a black man at the apartment mention contacting "G-Money" to obtain more crack cocaine. According to Curtis, the defendant's "street name" is G-Money.[13]

Curtis's investigation also revealed that Smith, Whiting, and the defendant have "lengthy" criminal records, including convictions of armed robberies, assaults, and controlled substance violations. Based on this information, Curtis requested search warrants for Smith's apartment (31 Seaview Street, Plymouth) and unit six of the Capeway[14] Motel, Kingston.

The defendant raises three challenges to the sufficiency of the search warrant for unit six of the Bay View Motel: that C-3 did not satisfy the second prong of the *Aguilar-Spinelli*[15] test, that is, the "basis of knowledge" prong[16]; that C-3's knowledge is primarily based on hearsay evidence; and that the affidavit does

[13]It is unclear from the record how Curtis obtained this information.

[14]It is unclear from the record how Curtis converted the Bay View Motel, which is cited throughout the affidavit, to the Capeway Motel. It is of note, however, that the actual search warrant application lists Bay View Motel.

[15]See *Aguilar* v. *Texas*, 378 U.S. 108, 114 (1964); *Spinelli* v. *United States*, 393 U.S. 410, 415 (1969).

[16]The defendant concedes that C-3 satisfied the first prong of the *Aguilar-Spinelli* test, that is, the "veracity" prong. See generally *Commonwealth* v. *Zorn*, 66 Mass. App. Ct. 228, 232 & n.6 (2006).

not establish the requisite nexus between the criminal activity, the defendant, and his motel room. We address each argument in turn.

b. *Informant's basis of knowledge.* The defendant asserts that the affidavit failed to establish that the information provided by C-3 is credible or worthy of belief or that C-3 had a sufficient basis of knowledge from which the magistrate could infer that the defendant stored cocaine in the subject motel room. See *Commonwealth* v. *Upton*, 394 Mass. 363, 374-377 (1985) (affidavit requires showing of informant's veracity and basis for knowledge). The defendant further asserts that we should exclude the information related by C-3, as learned from Furtado, as impermissible hearsay.

We note that C-3's statements relating to the sales of crack cocaine from Smith's residence were corroborated by C-1's statements, C-2's statements, and the two periods of independent surveillance by Detectives Curtis and Flood. See *Commonwealth* v. *O'Day*, 440 Mass. 296, 301 (2003) ("[i]ndependent police corroboration of an informant's tip can compensate for deficiencies in either or both [*Aguilar-Spinelli*] prongs to satisfy the probable cause requirement"); *Commonwealth* v. *Mebane*, 33 Mass. App. Ct. 941, 942 (1992) (same); *Commonwealth* v. *Richardson*, 37 Mass. App. Ct. 482, 485-486 (1994); *Commonwealth* v. *Russell*, 46 Mass. App. Ct. 513, 517-519 (1999) (corroboration by other confidential informants). Curtis's investigation had also established independent circumstantial evidence corroborating that the defendant was Smith's supplier. This included the defendant's arrest during the execution of the December 15, 1993, search warrant, the discovery of the walkie-talkie radio during the same search, the statements by the motel owner that the defendant was staying at the Bay View Motel and often operated the specified blue motor vehicle, and Curtis's and Flood's several observations in January, 1994, of the blue motor vehicle parked near Smith's residence in the manner similar to that described by C-3. Lastly, C-2 informed Curtis that he had overheard a person at Smith's apartment mention contacting the defendant for more cocaine. Thus, assuming arguendo that C-3 lacked a sufficient basis of knowledge, there was sufficient compensating corroboration.

In addition, as the affidavit establishes that Furtado could have had a basis of knowledge for the statements he made to C-3 relating to the defendant, their use in the affidavit was permissible. See *Commonwealth* v. *Zorn*, 66 Mass. App. Ct. 228, 233 (2006) ("It is well established that hearsay, standing alone, can satisfy the basis of knowledge prong, if reliable"). Furtado was among those present during the execution of the December 15, 1993, search warrant and was living at the apartment as of January, 1994. As both C-3 and independent police investigation established that the defendant was a frequent visitor to Smith's apartment, it is reasonable to infer that Furtado knew why the defendant visited the apartment, what the defendant brought to the apartment, the methods used by Smith to contact the defendant, and if anyone accompanied the defendant on his visits to the apartment. Moreover, Curtis had independently corroborated that the defendant operated the specified blue motor vehicle and that he was staying at the Bay View Motel. Lastly, as early as January 1, 1993, C-1 reported that the inhabitants of Smith's apartment were concerned about attention generated by vehicular activity outside their apartment.[17] Thus, it is reasonable to infer that Furtado, an inhabitant of the apartment, was aware of both the vehicle driven by the defendant and the methods employed by the defendant to minimize exposure. The defendant's argument that Furtado's statements lacked a basis for reliability is thus not persuasive.

c. *Nexus.* "[T]he information in the affidavit must be adequate to establish a timely nexus between the defendant and the location to be searched and to permit the determination that the particular items of criminal activity sought reasonably could be expected to be found there." *Commonwealth* v. *Luthy*, 69 Mass. App. Ct. 102, 105 (2007), quoting from *Commonwealth* v. *Gallagher*, 68 Mass. App. Ct. 56, 59 (2007). See *Commonwealth* v. *Santiago*, 66 Mass. App. Ct. 515, 521 (2006); *Commonwealth* v. *Eller*, 66 Mass. App. Ct. 564, 565 (2006). See also Grasso & McEvoy, Suppression Matters Under Massachusetts Law

[17]After speaking with the registered owner of the vehicle, the police corroborated Furtado's statement that the blue motor vehicle was often operated by a black male named Glenroy, as he was the party named in the rental agreement.

§ 8-2[d][5] (2006-2007). "The connection between the items to be seized and the place to be searched does not have to be based on direct observations; it may be found by looking at the type of crime, nature of the items, the suspect's opportunity to conceal items, and inferences as to where the items are likely to be hidden." *Commonwealth* v. *Luthy, supra,* quoting from *Commonwealth* v. *Gallagher, supra.* See *Commonwealth* v. *Harmon,* 63 Mass. App. Ct. 456, 461 (2005). See also *Commonwealth* v. *Donahue,* 430 Mass. 710, 712 (2000) (permissible to establish nexus without direct observation); *Commonwealth* v. *Hardy,* 63 Mass. App. Ct. 210, 213 (2005) ("The fact that police never observed short-term visitors or other evidence of drug transactions at the defendant's residence . . . is not fatal to probable cause, because the defendant's usual method of operation was to deliver drugs away from his apartment"). In reviewing the affidavit, we are mindful that it "should be read as a whole, not parsed, severed, and subjected to hypercritical analysis." *Commonwealth* v. *O'Day,* 440 Mass. at 301, quoting from *Commonwealth* v. *Blake,* 413 Mass. 823, 827 (1992).

The central issue is whether the magistrate's inference that drugs were likely to be found in the motel room was reasonable. We conclude that it was. First, it was reasonable for the magistrate to conclude that the defendant was engaged in a type of drug delivery service that involved the regular delivery of drugs to Smith's apartment. This included evidence of a one-year pattern of crack cocaine sales from Smith's apartment, and reasonable inferences — drawn from at least two informants' statements that the defendant was Smith's supplier, an informant's statement that Smith contacted the defendant to procure additional drugs, the defendant's earlier arrest at the apartment, and police observation of the same blue motor vehicle parked at both the Bay View Motel and near the apartment — that the defendant was likely a regular visitor to Smith's apartment for the purpose of supplying cocaine. Cf. *Commonwealth* v. *Matias,* 440 Mass. 787, 795 (2004) (fact that drugs were regularly sold out of first apartment searched was significant factor in supporting probable cause to search nearby "stash" apartment).

Second, the affidavit established that Smith used a walkie-talkie radio to contact the defendant, that the defendant was staying in unit six of the Bay View Motel, and that Smith's resi-

dence and the motel were less than one-quarter mile apart. Given the limited range of a walkie-talkie radio, it was reasonable for the magistrate to infer that when Smith contacted the defendant, he was likely in his room at the motel. This inference is further supported by Furtado's comment to C-3 that the defendant was at the motel when contacted by Smith.

Third, the magistrate was presented with contextual underpinning suggesting that the motel room was likely the base for the defendant's drug delivery operations. This included statements by the motel owner that the defendant was staying at the motel and often operated a specific blue motor vehicle. There were also observations by the police on several occasions that the same blue motor vehicle was parked near the vicinity of Smith's apartment. As the magistrate was aware, the blue motor vehicle was rented to a third party, supporting an inference that the defendant stored his supply of drugs in the motel room rather than the vehicle. See *Commonwealth* v. *O'Day*, 440 Mass. at 303 (unlikely that defendant "would keep so large a supply of drugs in the truck while at home"); *Commonwealth* v. *Hardy*, 63 Mass. App. Ct. at 213. Contrast *Commonwealth* v. *Stegemann*, 68 Mass. App. Ct. 292, 301 & n.20 (2007) (no probable cause because court determined only rational inference supported by affidavit was that defendant stored drugs at places other than his residence). This evidence, taken together, is more than sufficient to establish probable cause.[18] See *Commonwealth* v. *Matias*, 440 Mass. at 795 (warrant for stash apartment sufficient based on paperwork found in search of different apartment, heavy foot traffic between two apartments, name on mailbox, and proximity of stash apartment to apartment previously searched where drugs and evidence of drug activity were recovered).[19]

Contrary to the defendant's argument, the affidavit in this

---

[18]Observation of the defendant leaving the Bay View Motel and proceeding directly to Smith's residence was not necessary to enable an inference of probable cause to search the motel room. Contrast *Commonwealth* v. *Gallagher*, 68 Mass. App. Ct. at 58-59 (defendant drove directly from residence to controlled drug purchases).

[19]The search warrant affidavit in the *Matias* case, unlike the instant one, specifically alleged that the second apartment was a "stash" apartment. *Commonwealth* v. *Matias*, 440 Mass. at 790. That implication, however, can be read into the present affidavit. See *Commonwealth* v. *O'Day*, 440 Mass. at 301 (affidavit "should be read as a whole, not parsed, severed, and subjected to hypercritical analysis").

case does more than allege that probable cause to search the motel room was established merely because the defendant, a known drug dealer, was staying in the room. Contrast *Commonwealth* v. *Laughlin*, 40 Mass. App. Ct. 926, 926-927 (1996) (evidence that drug dealer resided at apartment and car involved in drug transactions was parked in front of apartment insufficient to establish probable cause). Rather, from these facts, it was not unreasonable for the magistrate to infer that the defendant arranged drug deals from the motel room, and that the defendant likely stored in the motel room drugs, implements or records related to the distribution of drugs, or fruits such as monies derived from drug transactions. See *Commonwealth* v. *O'Day*, 440 Mass. at 302, quoting from *Commonwealth* v. *Cinelli*, 389 Mass. 197, 213, cert. denied, 464 U.S. 860 (1983) (magistrate may draw " 'normal inferences as to where a criminal would be likely to hide' the drugs he sells"); *Commonwealth* v. *Luthy*, 69 Mass. App. Ct. at 107-108. See also *Commonwealth* v. *Gilbert*, 423 Mass. 863, 868 (1996), *S.C.*, 447 Mass. 161 (2006), quoting from *Commonwealth* v. *Beckett*, 373 Mass. 329, 341 (1977) ("An inference drawn from circumstantial evidence 'need only be reasonable and possible; it need not be necessary or inescapable' "); Smith, Criminal Practice & Procedure § 179 (2d ed. 1983 & Supp. 2006).

3. *Constructive possession.* On appeal, the defendant contends that there was insufficient evidence presented to the jury to permit the inference that he intended to exercise dominion and control over all the drugs found in the motel room. He contends that of the cocaine that was found in the motel room, only the 82.05 grams of crack cocaine found in the wall heater belonged to him, while the 31.02 grams of cocaine found in a cereal box belonged to Wynn. He argues that he was not involved in a joint venture for the distribution of cocaine. Pointing to his postarrest statement, in which he admitted to possessing the 82.05 grams of crack cocaine in the wall heater, he argues that he should not have criminal liability for the other stash. The defendant contends that the trial judge erred in denying his motion for a required finding of not guilty on the offense of trafficking in cocaine in an amount of one hundred grams or more, but less than 200 grams. We review the evidence in the light most favorable to the Commonwealth to determine whether any

rational trier of fact could have found the essential elements of the crime beyond reasonable doubt. *Commonwealth* v. *Latimore*, 378 Mass. 671, 677 (1979).

The relevant evidence has been summarized thus:

> "[T]he case was not tried before the jury on the 'separate stashes' issue. The Commonwealth's theory at trial was that the defendant either constructively possessed all the cocaine seized at the motel in Kingston or was culpable for the full amount as a joint venturer with Maurice Wynn. The Commonwealth characterized the transactions in the two locations as involving the movement of cocaine from Kingston (where the prosecutor said it was warehoused) to Plymouth (where the prosecutor argued it was sold). The defense at trial was that the defendant and Wynn acted independently of each other, and that the defendant dealt only with the cocaine found in the wall heater (82.05 grams), while Wynn was solely responsible for the cocaine found in the cereal box (31.02 grams). Based on this strategy, the defendant's trial counsel argued to the jury that the defendant should be found 'guilty of [the] amount over [twenty-eight] grams, under [one hundred].' This was a reference to the crime charged by G. L. c. 94C, § 32E(*b*)(2), which punishes trafficking in twenty-eight or more grams of cocaine, but less than one hundred grams. That crime calls for a less severe mandatory minimum sentence, and the offense was before the jury on their verdict form as a lesser included offense. The jury found the defendant guilty as charged of the more serious trafficking offense, expressly finding that he constructively possessed all the cocaine seized at the motel."

*Commonwealth* v. *Rabb*, 431 Mass. at 126 n.4.

"To permit a finding of constructive possession there must be evidence sufficient to infer that the defendant not only had knowledge of the items, but also had the ability and intention to exercise dominion and control over them." *Commonwealth* v. *Frongillo (No. 1)*, 66 Mass. App. Ct. 677, 680 (2006). "The requisite proof of possession 'may be established by circumstantial evidence, and the inferences that can be drawn therefrom.' " *Commonwealth* v. *Gonzalez*, 42 Mass. App. Ct. 235, 237 (1997), quoting from *Commonwealth* v. *LaPerle*, 19 Mass. App. Ct. 424, 426 (1985).

Here, the jury could have concluded that the defendant had constructive possession over all the drugs, as they were stored in common portions of the room (heater and kitchen cabinet) and the defendant had paid for the room. The jury heard testimony from the motel owner identifying the defendant (but not Wynn[20]) as regularly living in and paying for the motel room. Evidence of the defendant's involvement in drug trafficking, and of the warehouse-retail operation (including that the walkie-talkie radio in the motel room was tuned to the same frequency as the one found at Seaview Street), also buttressed the inference that he had dominion and control over both stashes. Moreover, the jury heard testimony, during the cross-examination of Gordon Fogg, chief of the Kingston police, that when the defendant was shown the two stashes of cocaine retrieved from the motel room, he said, "you got me." The defendant admitted that the larger stash, 82.05 grams, that the officers had found in the wall heater belonged to him. He told the officers that the cocaine in the cereal box belonged to his cousin, Wynn. This admission concerning the narcotics that the defendant ascribed to Wynn demonstrated his awareness of the other drugs in the room for which he paid rent. The jury were not required to believe the defendant's claim that the other stash belonged to Wynn. Moreover, when confronted with the minimum sentence for possession of one hundred grams of cocaine, the defendant offered to inform on others in exchange for a reduced sentence. From this the jury could have inferred that the defendant had displayed an awareness of guilt for possession of all the cocaine, and sought to bargain for a reduced sentence. In sum, the evidence was sufficient to establish constructive possession.[21]

*Judgment affirmed.*

---

[20]The motel owner stated that Wynn had initially rented the room for one night, but that she did not see him again.

[21]The jury could also properly infer that both the defendant and Wynn had the ability and intention to exercise dominion and control over the narcotics. See *Commonwealth* v. *Bonilla*, 32 Mass. App. Ct. 942, 944-945 (1992). Here, a significant quantity of narcotics and the walkie-talkie radio were in the motel room in a common area readily accessible to both the defendant and Wynn. See *ibid.*